THE PEOPLE, and the HEALTH COMMISSIONERS OF NEW-YORK *vs.* MAURAN and another.

Ejectment will lie for land which was below high water mark in navigable waters and arms of the sea, where it has been filled up and made hard land.

And it seems that the title of the people of the state, in their right of sovereignty, attaches to such lands, and that they may recover them, in ejectment, without proof of title under the parties by whom the lands were reclaimed. *Per* McKissock, J.

The authority to the commissioners of the land office to grant land under the waters of navigable rivers, may be executed by their causing letters patent to be issued under the seal of the state; or, the commissioners may grant such lands under their own hands and seals. *Per* McKissock, J.

A patent for lands under water not containing a reservation of gold and silver mines is not for that reason void.

It is not necessary for one making title by patent to such lands to show that notice of the application for the grant as required by the statute was given.

Where a patent granted to a turnpike company, bounded the lands under water which were the subject of the grant by the *terminus* of the turnpike road of such company at the margin of the water; *held* that this was conclusive evidence that the grant was made to the proprietors of adjacent lands.

A patent for lands under water cannot be invalidated in a collateral action by proof that it was granted for other purposes than to promote the commerce of this state, as that it was granted to a turnpike corporation.

A corporation authorized to take and hold land for the purposes for which it was created, may take a grant of lands in fee.

And where such a corporation had taken a grant of lands in fee and had conveyed the same in fee to individuals, and was afterwards dissolved by a statute limiting the duration of its charter; *held* that the title of the grantees was not impaired by the dissolution.

EJECTMENT, tried at the Richmond circuit in November, 1846, before EDMONDS, Cir. J.

The declaration was for a lot of land at Tompkinsville in

the town of Castleton, on Staten Island, which was particularly described, and was *made land,* formed by filling up in the bay. The first count was upon the possession of the people, and the second and third upon that of Vanderburgh and others, commissioners of health of the city of New-York in trust for the people, pursuant to 1 *R. S.* 444, § 1—the premises being claimed as belonging to the Marine Hospital.

It was proved that prior to 1815, the premises were land below ordinary high water mark under water on the easterly shore of Staten Island, and that at the time of the commencement of this suit, having been filled up and made solid land, they were in the possession of the defendants and occupied by them for docks, wharves, and buildings. It was also proved that the plaintiffs, other than the people, were acting commissioners of health of the city of New-York.

The defendants' counsel moved for a nonsuit on the ground that ejectment would not lie at the suit of these people for land below high water mark, unless it had been appropriated by law to some specific purpose. The motion was denied.

The defendants then offered in evidence letters patent under the great seal of this state, dated April 3, 1816, signed by the then governor, and countersigned and approved as required by law, to The Richmond Turnpike Company, purporting to grant to that corporation " and their assigns, as a good and indefeasible estate of inheritance forever," certain land under water below low water mark in the bay of New-York, which was admitted to embrace the premises in question, and which was said in the patent, to lie " adjoining the end of the turnpike road of said company."

The plaintiffs' counsel objected to the introduction of the patent in evidence, on the grounds, 1. That land under water could not be granted by *patent,* but only by a *conveyance* executed by the commissioners of the land office. 2. That the grantees were not authorized to take a grant of land under water, especially as it did not appear that they had ever laid out their turnpike road over the premises. 3. That the grantees were not the proprietors of the adjacent land, and had not

shown that the notice of applying for the grant required by law had been given. 4. That the patent was void for not containing a reservation of gold and silver mines. 5. That land under water could only be granted for the purposes of commerce, and that a turnpike corporation could not take for such a purpose. The objections were overruled and the patent was read in evidence. The plaintiffs rested.

The defendants gave in evidence the " Act to incorporate the Richmond Turnpike Company," passed March 31, 1815, (*Stat. p.* 119,) and the act to amend the same, passed January 31, 1817, (*Stat. p.* 16;) and also a conveyance in fee from the Richmond turnpike company to the defendants in this suit, of the premises embraced in the letters patent. The deed was dated January 24th, 1844, was executed under the common seal of the corporation, and was shown to have been given pursuant to a resolution of the board of directors. By the 11th section of the act to incorporate the Fulton Bank, it was provided that the franchises of the Richmond turnpike company might be acquired by that banking corporation; and it was declared that the existence of both corporations should cease on the 1st of March, 1844. (*Stat.* 1824, *p*, 144, §§ 1, 11.) It was admitted that the contemplated union had taken place and that the corporate existence of the turnpike company ended on that day. The defendants further proved, that in 1815 the premises which subsequently formed the track of the Richmond turnpike road from the water of the bay opposite the premises in controversy in this suit, were in the possession of the state under claim of title and actually formed part of the quarantine grounds, being contained within the enclosure of those grounds; and that the Richmond turnpike road was laid out through those grounds to the water under which the premises in question were then lying, by the commissioners of the health office, pursuant to the statute, (*Laws* 1815, *p.* 80, § 3.) The defendants also gave in evidence the proceedings of the commissioners appointed to lay out the Richmond turnpike road under the charter of that company, by which it appeared that the road was laid out in 1815, commencing at the bay at high water mark, opposite the premises

in question and running across the island; and also the pro
ceedings to acquire title to the lands of individuals; but no
damages were assessed or claimed, for the track of that part
of the road passing through the quarantine grounds from the
premises in question. The defendants also proved that pur-
suant to the amendatory act of 1817, the stock of the two ferry
companies mentioned in that act had been consolidated with
the stock of the Richmond turnpike company, and that there-
upon the turnpike corporation had leased ferry slips and wharves
at Whitehall and Jersey City.

The plaintiffs' counsel again insisted that the letters patent
were void for the reasons before stated, and because the testi-
mony did not show any legal ground for issuing them. The
defendants' counsel maintained that the validity of the patent
could not be questioned in this suit, but only in a direct pro-
ceeding by *scire facias*, and that it divested the state of its title
to the premises; and requested the judge so to charge.

The judge declined to charge to that effect, but declared his
opinion to be that the patent was unauthorized and void, be-
cause it was not issued to the proprietors of adjacent land; that
if otherwise the title which the company acquired by the pat-
ent was for the purposes of the said corporation, and the charter
of the corporation having expired in consequence of the election
of the company to merge their existence in that of the Fulton
Bank, the title acquired by the patent was at an end; and that
the company had no power to convey the lands to other per-
sons for private purposes: but to enable the defendants to re-
view the question, he directed a verdict for the plaintiffs on the
first count of the declaration, subject to the opinion of the court,
with liberty to turn the case into a bill of exceptions. The de-
fendants' counsel excepted to the several opinions and decisions
of the circuit judge.

*S. Sherwood,* for the defendants, moved for a new trial on
a case. 1. The patent is conclusive evidence of a grant by
the state and cannot be impeached collaterally. (*Jackson* v.
*Lawton,* 10 *John.* 23; *Jackson* v. *Hart,* 12 *id.* 77, 82; *Jack*

*son* v. *Marsh,* 6 *Cowen,* 281, 283.) 2. The grant being to the corporation and its "assigns, as a good and indefeasible estate of inheritance forever," was of a fee in express terms; and the right of disposal at pleasure is inseparably incident to such an estate. It was essential to the purposes of the corporation that they should have wharves, &c. at the *terminus* of the road. The grant was therefore for the proper purposes of the corporation and such an one as it could take. 3. Even if the transfer to the defendants was void, the state cannot recover, for, on that supposition the property is vested in the directors as trustees for the corporation. 4. The people of this state cannot maintain ejectment for lands under water in the bays and arms of the sea, against any person. The right of *eminent domain* does not extend to such lands. It is true, such land may be disposed of or regulated by the law-making power. In this case the legislature has only directed that such property may be granted. 5. The provisions of the act of 1817 respecting the ferry companies, and that of 1824 concerning the Fulton Bank, by a just and necessary implication authorized the property to be disposed of for the advantage of the parties interested.

*H. Nicoll & J. Van Buren,* (attorney general,) for the plaintiffs.(*a*) 1. Land under water is as much the subject of an action of ejectment as any other; but if this were otherwise when this land was in its original state, it is now re-claimed and is subject to all the incidents of other land. (*Martin* v. *Waddell,* 16 *Pet.* 367, 418.) 2. The conveyance of land under water must be by grant executed by the commissioners of the land office and not by patent. (1 *R. L.* 293, §§ 4, 15, 16; *Dezeng* v. *Beekman,* 2 *Hill,* 489; *Wilson* v. *Troup,* 2 *Cowen,* 199.) 3. The premises were not a part of the land over which the turnpike was laid. (1 *R. L.* 231, § 3; *Angell & A. on Corp.* 114, 115; 7 *Serg. & Rawle,* 319.) 4. The grantees in the patent had, at most, only an easement over the adjacent land. They could not therefore take a grant of land under water.

5. It was not shown that they had given notice of the application, as required by law. (1 *R. L.* 293, § 4.) 6. Lands under water can be granted only for the purposes of commerce. A turnpike corporation is not concerned with matters of commerce. 7. The patent is void for not containing a reservation of gold and silver mines. 8. It is void for conveying a greater estate than the grantee was authorized to take. (3 *Bl. Com.* 384; 1 *R. L,* 293, § 5.) 9. The turnpike company could only acquire a qualified title, defeasible at the termination of its charter. (*Hooker* v. *The Utica & Minden Turn. Co.* 12 *Wend.* 371; *Report in Senate Doc. of* 1843, *No.* 11.)

*By the Court*, McKissock, J.   The first question that arises in this case is, whether an action of ejectment will lie for the premises in question?   They are situated below high water mark on the shore of New-York bay.   To determine that, it will not be necessary to decide whether that action can in any case be maintained by the people for lands under the navigable waters of the state.   For whatever was originally the condition of these premises in that respect, they had before suit brought been transformed by human labor into dry land.   It might as well be said of the property in Water, Front and South-streets in the city of New-York, and other places similarly formed, which have been the subjects of private property for years, that they are lands under water.   There can be no doubt that the action would be maintained.   And the plaintiffs having shown a *prima facie* right to recover, the judge was correct in refusing to nonsuit at the request of defendants.

The remaining inquiry arises on the point, whether the letters patent, together with the deed from the patentees to the defendants produced by them were a bar to the action.   The plaintiffs object that the grant from the commissioners of the land office is void, because it was made by patent and not by deed.   The first section of the act concerning the commissioners of the land office, (1 *R. L.* 292,) provides, that they shall have power "to direct the granting of unappropriated lands within the state according to such powers and directions as shall be

from time to time prescribed by law." By the 4th section of the same act it is declared " that it shall be lawful for the said commissioners to grant so much of the lands under the waters of navigable rivers, as they shall deem necessary to promote the commerce of the state; *provided always* that·no such grant shall be made to any person whatever other than the proprietor or proprietors of the adjacent lands." Though these sections vary somewhat as well in phraseology as in the subject of them—the first authorizing the commissioners to *direct* the granting of unappropriated lands, while the second gives them power to *grant* certain lands under the waters of navigable rivers, it is to be seen whether the same form of conveyance is not sufficient in either case. It has never been doubted but that in the case of unappropriated lands, the proper mode of conveyance was by letters patent under the seal of the state. That was the manner of making grants by virtue of the prerogative of the British crown. And the people by their right of sovereignty, being the ultimate proprietors of all the lands of the state, have adopted the same mode of alienation. By the statute, the commissioners of the land office are constituted the agents of the state, to convey the lands under the waters of navigable rivers in certain cases. Hence that power is to be exercised, and every grant under it is to be the proper act and deed of the principal; and it would be difficult to devise any mode more simple and effectual, than that by ordinary patent. Besides, these lands under water are as much the property of the state, subject to the public servitude for navigation, as other unappropriated lands. There seems to be no adequate reason for supposing that the legislature intended that the formei should be conveyed by the deed of the commissioners, while the latter were to be granted by patent, especially when it is seen that in both cases the power to cause the conveyance to be made, resides in the same body—the commissioners. It is probably true, that these lands might have been granted by the commissioners' deed; but I do not think that where they adopt the method of conveying by patent that the act is void. Moreover the commissioners have from the commencement of the

government to the present time, used such a conveyance in similar cases; and of this the court may take judicial notice. The patents are matters of public record. We learn from this source the construction put on the statute by the high officers of the state, including the governor and attorney general, in the times of the first enactment on the subject. This is important authority on the point, and much superior to old books and the exposition of writers cotemporaneous with ancient statutes, which Coke denominates *benedicita expositio.* The most eminent writers lay great stress on the construction put upon statutes by sages and writers who lived about the time of their enactment. (*Dwarris on Statutes,* 693.) This original interpretation sustained by a practical commentary down to the present time, together with the argument to be drawn from the fact that it is in conformity with the spirit and intention of the statute, must have controlling influence. There is, therefore, in my opinion, no valid objection to the manner of the grant in the present case.

It is also objected that the patent was void for not excepting gold and silver mines, as directed by the statute. The act requires that patents shall contain an exception and reservation of such mines. (*Id.* § 5.) To this it may be answered in the first place, that if, as is contended by the plaintiff's counsel and as is admitted above, it was lawful for the commissioners to have conveyed lands under water by their deed, then the provision in relation to gold and silver mines does not, nor did the legislature intend it should relate to such lands; for the provision applies, by its terms, only to patents. For inasmuch as the statute provides that the commissioners shall have power to *direct* the granting of unappropriated lands, thereby clearly indicating that it should be done by patent; it also declares that it shall be lawful for them to *grant* the lands under the waters of navigable rivers, manifestly leaving it to the determination of the commissioners whether to use their own deed or a patent. It follows that there was no intention to provide for the exception of those mines in grants of lands of the latter description. If there had been, it would not have been left to

depend on the form of conveyance that might be adopted
Here also we have light reflected upon the question from the
conduct and acts of the eminent men of the government co-
temporaneous with the statute. By an examination of the
records of the office of the secretary of state down to the year
1832, it appears no patent for lands under water had ever con
tained the exception referred to. Moreover the mineralogical
history of the world affords no evidence of the discovery of gold
or silver mines beneath the waters of navigable rivers, and
there is no reason to expect such a discovery. With this we
must suppose the legislature to have been acquainted, and we
cannot, therefore, presume that so useless a provision would
have been made as one to guard against an event not contem-
plated as within the reach of possibility.

But the commissioners in the present case were the agents
of the state, and hence if their acts are to be estimated accord-
ing to the rules applicable to private agents, this patent may
be good for the lands and void for the mines, if any should
hereafter be discovered, the two subjects being easily separable.
The rule in such cases is that if an agent do what he is au-
thorized to do, and more, the execution is good for what is
warranted and bad for the excess, provided such excess is
manifestly distinguishable. (*Perkins on Convey.* 187; *Adams*
v. *Adams, Cowper,* 651; *Livermore on Agency,* 101, 102;
*Story on Agency,* §§ 166, 168, 2d *ed.*) And that the principle of
the rule is applicable to grants by patent, appears by the case
of *Patterson* v. *Jenks,* (2 *Peters,* 216, 236.) It was there held
that a patent from the state of Georgia for lands partly without
and partly within the limits of the lands claimed by the Indians,
was good for the former while it was void for the latter.

It was also insisted that the patent was not evidence of a
grant without proof that the notice of the application therefor
had been given as provided by the statute, and also that the
grantees were the proprietors of the adjacent lands. These
objections are untenable. The principles governing here have
no analogy to the rules applicable to the cases to which we
were referred on the argument, such as purchasers under sales
for taxes and the like. Parties claiming under such proceed-

The People *v.* Mauran.

ings are bound to show the existence of all the prerequisites necessary to give the officer under whom they purchased authority to sell, for the reason that he has but a special authority to do any act of that sort. On the contrary, it has at all times been held that a patent was *prima facie* evidence that it was regularly issued—that all things preliminary had been performed and complied with; the legal presumption in such case being that public officers have done their duty *omnia solemniter acta.* (*Ross* v. *Reed,* 1 *Wheat.* 482, 487; *Bouldin* v. *Massie's heirs,* 7 *id.* 122, 149; *Jackson* v. *Marsh,* 6 *Cowen,* 281.) The description of the premises in this grant bounds them on the lands of the grantees or their road, which is conclusive of the fact of the proprietorship of the adjacent lands for the purposes of the present action.

It was finally objected by the plaintiff's counsel that the patent was void, because the grantees had no authority to take a grant of land under water; and more especially because it did not appear that the commissioners to lay out their road had ever done so over the premises granted, and because the authority vested in the commissioners of the land office was improperly exercised by this grant to a turnpike company.

A patent being a record, it is a principle well settled that unless it is absolutely void on its face it cannot be assailed in a collateral action, but only in a proceeding directly for the purpose; and this is even true though it were issued by mistake, or obtained by fraud or misrepresentation. (*Jackson* v. *Marsh, supra; Jackson* v. *Lawton,* 10 *John.* 23; *Jackson* v. *Hart,* 12 *id.* 82; *Bagnel* v. *Broderick,* 13 *Peters,* 436, 450.) Though it does not appear on the face of the patent that the grantees are a turnpike company, and that the premises lay adjoining their road, still I know no rule of law by which it is on that account absolutely void. It is one of the ordinary powers of a corporation to take, hold and convey real estate; and whether this corporation had such power or not, must be determined by its charter and the acts amending the same, and by any other statutory provisions relating to the subject generally. This would certainly produce an inquiry altogether outside of the instrument itself.

The People *v.* Mauran.

It is still less an intrinsic objection to its validity, that the power of the commissioners was improperly exercised in granting lands to a turnpike company. The truth of the legal proposition embraced in this objection is by no means a consequence of the fact stated. The question must be determined by the answer to the inquiry whether the commissioners had the general authority to make the grant, and not whether they acted with proper discretion or not; and what may or may not tend to the promotion of commerce is certainly by no means at all times self-evident. Admitting, for the present, that the question of the validity of the patent on account of the first objection stated by the court could be determined in the present suit, it by no means follows that it was void for the reasons stated. For although the statute provides that no grant shall be made to any other than the proprietor of the adjacent lands, yet such grant is not in terms declared void for that reason. The revised statutes declare that a grant to any other than an adjacent proprietor shall be void. A strong inference arises out of this provision that such a consequence would not have followed under the previous legislation on the subject. (1 *R. S.* 208, § 67.) Besides, the grantees were at the time a corporation having a right of perpetual succession, and had possession of the adjacent land; for though the road only ran to high water mark, and the description in the grant speaks of low water mark, still the premises are described as bounded on the end of the turnpike road. From this I infer that the present case did not come within the reason of this provision of the statute, which was intended to be precautionary and directory—the main object being to prevent the evil of depriving any one of the common right of a free passage from his own lands to the waters of adjacent navigable rivers.

But it follows from the principles already laid down, the evidence that the grantees were not the proprietors of the adjacent lands being extrinsic, that even if that were sufficient to authorize a judgment vacating the patent in a regular proceeding for that purpose, still it can produce no correspondent result here in a collateral action. A patent, valid on its face cannot be

affected but by regular course of pleading on *bill* or *scire facias*. In such cases an objection cannot be set up in actions of trespass or ejectment. (*Bagnell* v. *Broderick, and Jackson* v. *Lawton, supra.*) This rule is not founded merely on a principle of evidence regarding the admissibility of testimony, but on the principle that a record cannot be overthrown, except by a judgment of a court on an issue upon the precise question of its validity. The fact, therefore, that in the present case the evidence was before the court, and was produced by the defendants themselves, did in no respect alter the rule. To use the language of the chief justice of Kentucky in the case of *Blescoe's devisees* v. *Wells,* (4 *Bibb,* 329,) a patent "cannot be avoided by matter *dehors* the grant. The commonwealth cannot be divested of her title except by record, and she cannot be reinvested except by matter of record." (*See also Com. Dig. tit. Patent, T.* 1 *to* 8.) No evidence from without can affect a record except it be put directly in issue. "It importeth in itself such absolute verity that it cannot receive any trial by witness or by jury, but only by itself." (*Co. Litt.* 117, *b ; id.* 260, *a.*) The cases of *Polk's Lessee* v. *Wendal,* (9 *Cranch,* 87,) and *Jackson* v. *Stanly,* (10 *John.* 133,) are neither of them opposed to the foregoing doctrine. In the first, the state of North Carolina had granted lands which had been ceded to the United States, which she had no general power to do, more than to convey lands in the state of Virginia, and could only make a valid grant on the existence of certain prerequisites, when she conveyed to the United States ; and proof was allowed to show whether these conditions precedent had been performed or not. In the other case, evidence was given to show that a paten. was intended to have been given to *Daniel* Huntington and not to *David,* but there had been an act of the legislature reciting the mistake, and declaring that the title should vest in Daniel.

Neither was the effect of the dissolution of the turnpike company such as was declared by the circuit judge. It was assumed that the company took an estate under the patent and conveyed the same to the defendants—during their charter. It is unnecessary to inquire what would have been the result, if the

company had been dissolved while holding the premises. The grant to the Richmond Turnpike Company was to them and their assigns in fee; and whether they could have held it against proceedings by the state, is of no consequence to the present question. They had, at the worst, but a defeasible estate in fee; and that they had the right to convey is a legal proposition that will not be disputed. Every corporation may convey whatever they have taken, whether able to hold it or not. The consequence is, that the grantees of the company took the estate as they held it, absolute or defeasible as might be. Corporations have a fee simple for the purposes of alienation, and a determinable fee for the sake of enjoyment. (2 *Kent*, 281; *Preston on Estates*, 250.) So that the grantees of the corporation in the present case may stand in a better, but not in a worse condition than the grantors. Hence the defendants, even if they hold a defeasible estate, will continue to hold it, as an alien grantee holds, till office found.

New trial ordered.